UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JOHN S. LANDREE, | CASE NO. 3:10-CV-05353-RBL |
| Plaintiff, | |
| v. | ORDER ON DEFENDANTS' MOTION FOR RECONSIDERATION |
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, a foreign corporation; and SIMPSON HEALTH AND WELFARE PLAN, an employee welfare and benefit plan, | |
| Defendants. | |

## I.    INTRODUCTION

This matter comes before the Court upon Prudential's Motion for Reconsideration. (Dkt. #25.) On June 13, 2011, the Court denied Prudential's Motion for Summary Judgment. (Dkt. #24.) To reach its decision, the Court conducted a de novo review of Prudential's decision to deny Landree's claim for benefits because the Court found WAC 284-96-012 (the Regulation) invalidated the discretionary language in the Plan. Under this de novo standard of review, there were genuine issues of material fact precluding summary judgment. Prudential contends this ruling was clear error because (1) the Regulation cannot retroactively change the terms of the Plan and (2) the Regulation is completely preempted by ERISA. Prudential contends its decision

to deny benefits should be reviewed under the abuse of discretion standard of review, and that under this standard of review, the Motion for Summary Judgment should be granted.

Landree responds that the Court was correct to apply the de novo standard of review to Prudential's decision. Landree argues the Washington State insurance commissioner has the authority to apply the Regulation retroactively because the regulation clarifies existing law and does not affect substantive rights. Landree argues that, if the court applies the abuse of discretion standard, the Motion for Reconsideration should be denied because a reasonable trier of fact could be left with a firm conviction that a mistake was made.

The Court's ruling is set forth below.

## II. FACTS

### A. The Plan

The Plan purports to give Prudential "the sole discretion to interpret the terms of the Group contract, to make factual findings, and to determine eligibility for benefits." (0345-46.)[1]

In relevant part, the LTD coverage section of the Plan reads as follows:

**How Does Prudential Define Disability?**
You are disabled when Prudential determines that:
- you are unable to perform the ***material and substantial duties*** of your ***regular occupation*** due to your ***sickness*** or ***injury*** . . .
***Material and substantial duties*** means duties that are:
- normally required for the performance of your regular occupation; and
- cannot be reasonably omitted or modified . . .
***Regular occupation*** means the occupation you are routinely performing when your disability begins. Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location. (0323, emphases in original.)

---

[1] Numbered citations refer to either the Administrative Record (0001-0295) or Plan documents (0296-0353). [Dkt. #s 18 & 19, respectively.]

**B. Prudential Denies Landree's Initial Claim for Long Term Disability**

**1. Landree Applies for Long Term Disability**

On January 9, 2007, Landree saw his primary care physician, Dr. William Brand. Brand noted Landree was experiencing "right anterior pleuritic chest pain" and had "fatty infiltration of the liver." (0169.) Brand concluded Landree's systems were "otherwise negative" and that his type two diabetes mellitus and hypertension were controlled. Brand listed ten conditions Landree suffered from, including hypercholestolemia and "chronic low pain."

On January 20, Landree experienced two spells of dizziness at work and a coworker drove him home. (0167.) His wife wanted him to go the emergency room but he did not.

On January 26, Landree met with Dr. Theodore Lau, a Cardiac Health Specialist. Dr. Lau noted Landree had normal left ventricular systolic function, left ventricular diastolic dysfunction, mildly elevated systolic pulmonary artery pressure, and that there were "no significant changes" from an earlier study taken on March 10, 2006. (0174.) Dr. Lau administered an exercise test and concluded the "raw data was unremarkable." (0175.)

From February to April of 2007, Landree attended counseling sessions with Lem Stepherson, Ph.D. According to a one-sentence note from Stepherson, this counseling addressed Landree's anxiety related to the death of a co-worker, a heavy workload, and multiple health related conditions. (0134.)

On February 12, Landree saw Dr. John Rowlands for a pulmonary consultation. Rowlands concluded the test results were mostly negative. (0173.)

Landree stopped working on February 22, 2007, and saw Dr. Brand on February 26. Brand wrote Landree was undergoing a disability evaluation and that he "feels anxiety and stress to the point where he feels he cannot return to work pending his disability evaluation." (0164.)

On March 19, Landree saw Dr. Paul Darby, an occupational health specialist at the Franciscan Occupational Health Clinic in Tacoma. Darby opined Landree's "medical problems have been mounting lately and the shift work is throwing his diabetes out of control." (0094.) Darby made the following diagnoses: (1) Type 2 Diabetes mellitus (2) Recurrent near-syncope (3) Coronary artery disease (4) Hypertension (5) Paroxysmal atrial tachycardia (6) Dyslipidemia (7) Diverticulosis (8) Gastroesophagul reflux disease (9) Chronic back pain. Darby opined, "I have received all of his medical records and reviewed those . . . Patient is not medically fit for the essential job functions. He is restricted from shift work, working alone or remote from observation, work at unprotected heights, working with dangerous equipment, or wearing any respirator." (Id.)

### 2. Prudential Evaluates and Denies Landree's Initial Claim

On June 12, 2007, Prudential received Landree's claim for LTD. On that date, Dusti LaFlamme, a Claim Manager for Prudential, wrote the following on an internal note: "No eligibility issues. EE is [redacted] yr old shift coordinator TD since 2/23/07 due to type 2 diabetes mellitus, CAD, PAT and chronic back pain. EE reports dizzy spells and heart problems." (0197.)

On June 14, Michael Chretien, a Vocational Rehabilitation Counselor at Prudential, created a short report for Prudential to understand how Landree's job is normally done. Chretien based his report on reference manuals. Chretien briefly described the job duties of a "Pulp Plant Supervisor" but did not classify the work as light, medium, or heavy. (0198.)

On July 25, LaFlamme and Landree had a telephone conversation. Landree explained his medical conditions and indicated his job requirements included shift work, being HAZMAT certified, using ladders and bending. (0216.) On July 26, LaFlamme met with Team Leader Linda Conley. At this meeting, Prudential classified Landree's occupation as "light." (0200.)

On August 6, 2007, Prudential decided to deny Landree's claim. On that day, Sandra Chapkovich, RN, did a "clinical review" of records from Dr. Brand, Dr. Darby, Dr. Lau, and Dr.

Rowlands. The review consists of abbreviations and medical data not entirely understood by the Court. It appears Chapkovich looked at Landree's diagnoses and medical data and came to the conclusion Landree had no restrictions or limitations. (0201.) She closed the review by opining Landree "may have made a life choice to retire." (Id.) On the same day, Dr. Joyce Bachman affirmed Chapkovich's review in a brief note. Bachman opined, "[t]here is no contraindication for the claimant in doing shift work which he has been doing without incident." (0204.)

On August 13, 2007, Prudential denied Landree's claim in a letter written by LaFlamme. LaFlamme emphasized negative test results, lack of chest pain, and controlled hypertension and diabetes. The letter concluded, "[W]e find you are reasonably capable of performing an occupation requiring light work capacity duties." (0287-89.)

## C. Prudential Denies Landree's First Appeal

### 1. Doctor Visits Before the First Appeal

On July 24, 2007, Landree saw a back specialist, Dr. Carlos Moravek. Moravek noted Landree's pain intensity measured two out of ten, his range of motion was reduced, and he was nontender to most touches. (0052.) Moravek recommended an MRI.

On September 24, Landree saw Dr. Rowlands again. Rowlands noted that Landree's pleuritic chest pain had resolved and that his daytime sleepiness and sense of well-being had improved as a result of his retirement. (0059.)

### 2. The Dispute Over Landree's "Regular Occupation"

On August 14, LaFlamme informed Landree over the phone that Prudential had denied his claim. During this conversation, Landree took issue with Prudential describing his work duties as light. (0217.)

On September 7, Marc Swan, a Vocational Specialist at Prudential, sent a message to LaFlamme. He opined Landree's job description "appears closer to the medium range," and the twelve hour shifts and passing the respiratory physical were "issues of concern." (0220-21.)

Apparently these issues were not of that much concern. On September 10, Conley, LaFlamme, and Swan held a meeting to discuss Landree's claim. An internal note reads, "Based on review of new information, our prior decision does not change . . . Regardless of whether the occ[upation] is light or medium, EE is not precluded from performing his occupation." (0207.)

Sometime before September 28, Landree obtained legal assistance from attorney Teri Rideout. Rideout commissioned Shervey & Associates to do an occupation analysis of Landree's position. This analysis concluded the position exceeded light work capacity duties. (0131.)

On October 25, Dr. Brand wrote a letter to Rideout after he reviewed the Shervey occupation analysis. Brand opined Landree "has multiple medical problems which could be adversely affected by working irregular shift hours, stress on the job, and variation in temperature and environment." (0060.) Brand thought Landree's coronary artery disease, diabetes, and blood pressure would be "negatively affected" if he continued working at Simpson. Brand also wrote, "I do not believe Mr. Landree should ever be placed in a situation where he would have to wear SCBA breathing apparatus in a stressful rescue situation." (Id.)

On December 7, Rideout wrote a letter to Prudential. (0120.) Rideout emphasized that an MRI from 7/26/07 revealed spinal damage and reemphasized the recommendations of Dr. Darby and Dr. Brand. The letter enclosed the Shervey occupation analysis and MRI results.

Prudential responded to this letter with an appropriate step. On December 18, Angela Holland, an Appeals Specialist, ordered a Labor Market Survey to investigate whether 12 hour irregular shifts, respirator use, and Hazmat suits were a normal part of Landree's regular occupation. (0208.)

### 3. Dr. Syrjamaki's Review and Denial of Landree's First Appeal

On December 19, Prudential decided to bolster its decision with an external review. On that day, Holland wrote to a Southfield, Michigan company called Qualified Medical Examiners. She requested a specialist in occupational medicine conduct an "expedited handling" of an independent file review. (0284-85.) A specialist in internal medicine, Dr. Charles Syrjamaki, handled this request.

Syrjamaki dutifully conducted a file review for Prudential on December 27, 2007.[2] Syrjamaki reviewed medical records from Doctors Brand, Darby, Lau, and Rowlands as well as the one page note from the psychologist Lem Stepherson. Syrjamaki also reviewed the Shervey occupation analysis and letters from Landree and Rideout. Syrjamaki talked with Dr. Brand on the telephone and concluded from that conversation and other records that "the precipitating event for Mr. Landry [sic] going off work . . . was some anxiety and stress, which was situational at the time." (0050.)

Syrjamaki opined that none of Landree's individual conditions prevented him from working:

> In reviewing the medical records, Mr. Landree does not appear to be disabled from his job as a shift coordinator for Simpson Tacoma Kraft Company. Although he is 59 years of age and was moderately overweight, his job did not have significant physical demands that he could not do. It also appeared that although he did have significant medical disorders, these were stable and under good control. His diabetes mellitus appeared to be under good control by diet and oral medications. He had one episode of dizziness and near syncope but had a negative evaluation for this and had no recurrence. He did not have any significant coronary artery disease. His hypertension was under good control, and his degenerative arthritis and degenerative disk disease was no more than one would expect for a man his age. He had done the same job for 33 years, and although he was a shift coordinator, this was not a new job for him, and the notion that he was too ill to do shift work was not borne out by the medical records. (0050-51.)

---

[2] The Court notes that the review was completed the same day Syrjamaki received the request. (0044.)

Prudential paid Syrjamaki $1,625 for the 6.5 hours of work necessary for the file review. (0114.) Based on this review, Holland thought it unnecessary to wait for the results of the Labor Market Survey she ordered on December 18. (0209.) Holland upheld the decision to disallow benefits.

On January 9, 2008, Holland informed Rideout of the appeal decision in a letter. Holland emphasized that Landree left work due to "situational anxiety." (0282.) The letter quotes extensively from Syrjamaki's review and concluded "the medical evidence does not support any restrictions or limitation." (Id.)

### D. Prudential Denies Landree's Second and Final Appeal

On January 23, 2008, Linda Geis, Director at Vocational Directions LLC, completed the Labor Market Survey for Prudential that Holland had ordered on December 18. Of four Pulp Plants that had a Supervisor position, two reported using hazmat suits and irregular shift patterns like those used at Simpson. (0108-11.) Holland did not think this had any impact on her decision to deny the first appeal. (0210.)

On March 11, Jim Burg, a Simpson Human Resources Manager, sent a letter and description of Landree's position to Rideout. Burg emphasized the physical demands of the job and the fact that it was stressful. He explained the importance of Landree being on the Emergency Response Team, and that in 2007 a Simpson doctor would not approve Landree for continued employment because he could not pass the required physical. Burg opined that in his 43 years of Human Resources Management he could not recall an employee being more eligible for LTD benefits. (0069.)

On April 25, Dr. Brand sent a letter to Rideout. Brand wrote "stress and anxiety" were a "contributing factor" to Landree's difficulty at work, but went on to emphasize his other diagnoses.

(0041.) Brand believed it would be "unconscionable" for Landree to go back to work because of the high probability of a heart attack.

Rideout forwarded this information to Prudential along with a letter arguing Dr. Syrjamaki was ignoring recommendations of other doctors and Simpson. (0065.) In response, Holland decided the best course of action would be to have Dr. Syrjamaki conduct another review in light of the newly received opinions of Dr. Brand and Jim Burg. (0211.)

On June 17, Syrjamaki completed his second review, this time considering the letters from Brand and Burg, as well as the Labor Market Survey. Syrjamaki believed it was "unclear why Dr. Darby would not pass Mr. Landree on the physical examination, as it appeared that the coronary artery disease was minimal and insignificant, that the Type 2 diabetes mellitus was under good control, the cardiac arrhythmia (paroxysmal atrial tachycardia) was controlled, hypertension was controlled, and his pulmonary function tests were normal." (0023.) Syrjamaki opined that long-term risk factors do not provide a reason for why an individual cannot do a job. Syrjamaki did not mention the requirement of wearing a SCBA device or the work classification. Prudential paid Syrjamaki $875 for the 3.5 hours needed to complete this second review. (0005.)

On July 10, 2008, Marc Swan, the Vocational Specialist at Prudential opined that Landree's position "would best be described as a heavy strength demand occ[upation]." (0213.) The same day, Prudential sent Rideout a letter informing her that Landree's second appeal had been denied. (0270-74.) The letter quotes extensively from Dr. Syrjamaki's second review. The letter concedes Landree's job falls into the "heavy to very heavy" category, but concludes that "In absence of any medically supported restrictions or limitations, we still conclude that Mr. Landree has the functional capacity to perform the material and substantial duties of his regular occupation." (0272.)

His administrative remedies exhausted, Landree filed a Complaint on May 20, 2010 seeking LTD benefits, removal of Prudential as Plan fiduciary, and attorney's fees. Prudential filed its Motion for Summary Judgment on February 4, 2011. In his Response to the Motion, Landree argued the Regulation invalidated the discretionary language in the plan, and accordingly, the standard of review should be de novo. Prudential did not file a reply.[3] The Court conducted a de novo review and ruled there were genuine issues of material fact precluding summary judgment. Prudential now contends this ruling was clear error because (1) the Regulation cannot retroactively change the terms of the Plan and (2) the Regulation is completely preempted by ERISA. The Court will not reach either of these broad contentions because it is clear the Regulation cannot apply retroactively to Prudential's *decision* to deny Landree benefits, whether or not it could change the terms of the actual Plan. The Court will explain its retroactivity ruling and then turn to the underlying Motion for Summary Judgment under the abuse of discretion standard.

### III. DISCUSSION

**A. The Motion for Reconsideration is GRANTED as to the Court's retroactive application of the Regulation because Prudential had a vested right to a deferential review and Prudential denied benefits before the Regulation was issued.**

The Regulation took effect on September 5, 2009. For the Regulation to nullify the discretionary language in the Plan and change the standard to de novo, the Regulation must apply retroactively to July 10, 2008, the date Prudential issued its final denial of Landree's claim for LTD benefits. Landree argues Washington law controls the retroactivity issue, and that under Washington law, the Regulation applies retroactively because it clarifies existing law. Prudential

---

[3] Prudential's excuse for this is that the Scheduling Order (Dkt. #15) did not provide for reply briefs. The Court is not sure what to make of this excuse because the Scheduling Order did not provide for a Summary Judgment Motion in the first place. In any event, considerable time could have been saved had Prudential asked for leave to address whether the Regulation could apply retroactively to its decision to deny benefits.

argues the Regulation was a substantive change to the law, and that it had a "vested right" to a deferential review before the Regulation was issued.

Generally, prospective application of new administrative regulations is presumed. *Champagne v. Thurston County*, 163 Wn.2d 69, 80 (2008) (en banc). A regulation or statute cannot be applied retroactively "where the effect would be to interfere with vested rights." *Lawson v. State*, 107 Wn.2d 444, 454-55 (1986) ("Thus, for example, a statute may not be applied retroactively where the result would be to impair the obligation of contract."). However, courts may apply an amendment retroactively if the amendment serves to clarify the purpose of the existing rule. *Champagne,* at 80.

In *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, the Ninth Circuit held that the California state insurance commissioner could not retroactively nullify an ERISA plan's grant of discretionary authority by revoking a certificate of insurance. 522 F.3d 863 (2008). That Court stated, "Assuming that the Commissioner may prohibit insurance companies from using this discretionary clause in future insurance contracts, he cannot rewrite existing contracts so as to change the rights and duties thereunder." *Id.* at 867.

### 1. Prudential had a vested right to a deferential review.

Landree argues the Regulation authorizes reviewing courts to re-write existing contracts. Prudential argues it had a vested right to a deferential review and is legally exempt from a de novo review. "[A] vested right, entitled to protection from legislation, must be something more than a mere expectation based upon an anticipated continuance of the existing law; it must have become a title, legal or equitable, to the present or future enjoyment of property, a demand, or a legal exemption from a demand by another." *In Re Marriage of MacDonald*, 104 Wash.2d 745, 750 (1985).

The Regulation does not apply retroactively to Prudential's decision to deny benefits because Prudential had a vested right to a deferential review of decisions it made before the Regulation. Prudential and Simpson bargained for rights, duties, and obligations embodied in the Plan, and Prudential acted pursuant to the Plan when it denied Landree's claim for benefits. Prudential relied on more than a mere expectation of existing law when it decided to deny LTD benefits because Prudential and Landree were bound by the written terms of the Plan. Were it applied retroactively to the time the decision was made, the Regulation would impermissibly re-write those terms. The Regulation cannot have retroactive effect on this Court's review of Prudential's decision to deny benefits because if the Regulation were applied retroactively in that way, it would interfere with vested rights.

### 2. Prudential denied benefits before the Regulation was issued.

Landree seeks to distinguish *Saffon* on state law grounds, arguing that RCW 48.18.510, unlike the California insurance code, requires that non-complying insurance policies be read as though they were in compliance with the Washington insurance code. Landree argues that "Unlike California, Washington law promotes uniformity by 're-writing' existing policies so that they comply with Washington law." (Dkt. #27 at 5.)

Landree forgets the narrow scope of this Court's review. The Court can only review Prudential's decision to deny benefits *at the time* the decision was made. At that time, the discretionary language in the Plan complied with Washington law. *See e.g., Bartholomew v. Unum Life Ins. Cor. Of Am.*, 588 F.Supp.2d 1262 (W.D. Wash. 2008) (parties agreed that discretionary language in Plan was valid). The Court expresses no opinion on whether the Regulation would apply retroactively to an administrator's decision made *after* the Regulation was issued because that is not the situation presented here. The Court only rules that the

Regulation cannot affect the review of Prudential's decision because Prudential made that decision *before* the Regulation was issued.

Landree also argues that the Regulation applies retroactively to Prudential's decision because the Regulation clarifies existing law. At first blush, Landree appears correct because the Notice for proposed rule making accompanying the Regulation stated "These new rules inform and clarify . . . that the Washington insurance code prohibits the use of discretionary clauses." Wn. State Register 09-16-128. However, the proposed rulemaking goes on to say that "If *current* contracts or policies contain discretionary clauses, [administrators] are required to *administer* them as though they did not contain discretionary clauses." *Id.* (emphases added) This notice of proposed rulemaking does not stand for the proposition that a court reviewing an administrator's decision made before the Regulation must review that decision de novo.

The Regulation does not apply retroactively to Prudential's decision to deny benefits because Prudential had a vested right in a deferential review and Prudential made the decision before the Regulation was issued. Thus, the Regulation cannot invalidate the discretionary language in the plan in such a way that it affects the Court's review of Prudential's decision.

Abuse of discretion is the correct standard of review. A denial of benefits is to be reviewed under a de novo standard unless the benefit plan gives the administrator discretionary authority. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Abuse of discretion is the standard when the plan grants the administrator discretionary authority. *Id.* Here, the Plan grants Prudential discretionary authority, and the Regulation has no retroactive effect on the Plan, so abuse of discretion is the standard of review.

**B. The Motion for Reconsideration is DENIED as to the Court's denial of the Motion for Summary Judgment because a reasonable person could be left with a firm conviction that it was a mistake to deny Landree's claim.**

Landree argues the Motion for Reconsideration should be denied because a reasonable person could be left with a firm conviction that it was a mistake to deny Landree's claim. Prudential argues that the facts demonstrate they "acted reasonably" and "the fact that this Court previously found that the merits were too close to make a call under the *de novo* standard of review, compels the conclusion that Prudential is entitled to judgment" under the abuse of discretion standard. [4]

**1. Abuse of discretion standard**

Prudential oversimplifies the abuse of discretion standard. "Applying a deferential standard of review does not mean that the plan administrator will prevail on the merits." *Conkright v. Frommert*, 130 S.Ct. 1640, 1651 (2010). In ERISA cases, when the plan administrator has a conflict of interest, the level of protection provided by the abuse of discretion standard to administrators will depend on the facts of each particular case. *See Saffon* at 867-68 ("While we nominally review for abuse of discretion, the degree of deference we accord a claims administrator's decision can vary significantly.")

Beginning with *Abatie v. Alta Health* in 2006, both the Ninth Circuit and Supreme Court have whittled away the deference given to administrators possessing a conflict of interest while still referring to the standard as abuse of discretion. In *Abatie*, the Court said that the "conflict [of interest] must be weighted as a factor in determining wither there is an abuse of discretion." 458 F.3d 955, 965 (9th Cir. 2006). In *Saffon*, the Court elaborated on *Abatie*, stating that different levels of skepticism will be applied to an administrator's decision depending on various factors

---

[4] The Court would not describe its decision to deny Prudential's Motion for Summary Judgment under the de novo standard as a close call. That decision would have been closer had cross-motions been before the Court.

such as inconsistent reasons for denial or evidence of malice. 522 F.3d 863 at 868 (9th Cir. 2008). The Supreme Court's decision in *Metropolitan Life Ins. Co. v. Glenn* essentially affirmed *Abatie* but emphasized that weighing the conflict of interest does not turn abuse of discretion into de novo review. 554 U.S. 106 (2008). In *Conkright*, the Supreme Court added that a "single honest mistake in plan interpretation" does not deprive the plan of the abuse of discretion standard. 130 S.Ct 1640, 1644 (2010).

'Weighing' the conflict of interest is important because ERISA administrators have an incentive to abuse their discretion, but this weighing is difficult in practice because courts lack the information they need to gauge whether the administrators are abusing that discretion. *See Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 675. (9th Cir. 2011). Unlike insurance companies operating outside of ERISA, insurance companies handling ERISA plans may have an incentive to abuse their discretion because the statute shields them from bad faith claims. *Id.* District courts may have difficulty figuring out whether discretion is being abused because they must rely on the administrative record, which usually includes no evidence on how the administrator handled similar claims or what sort of internal directives were given to claims managers. *Id.* This is why, in reviewing a plan administrator's decision, the court "is making something akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records." *Abatie* at 969.

In *Salomaa*, the Ninth Circuit synthesized post-*Abatie* cases into a workable rule. The *Salomaa* court began by explicitly overruling the "any reasonable basis" test relied on by Prudential in their original Motion for Summary Judgment. 642 F.3d 666, 673-74. Today, in ERISA cases where an administrator possesses a conflict of interest, the test for abuse of

discretion today is whether the court is "left with a definite and firm conviction that a mistake has been committed." *Id.* at 676. An administrator abuses their discretion if their decision was "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record," and a "higher degree of skepticism is appropriate where the administrator has a conflict of interest." *Id.*

In *Salomaa*, the Ninth Circuit reversed the district court's decision in favor of the administrator after a trial on the administrative record. Here, the Court is faced with a Motion for Summary Judgment brought by Prudential. Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law. The Motion "should be granted where the nonmoving party fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1220 (9th Cir. 1995). Here, the standard the Court applies is whether there is evidence in the administrative record from which a reasonable fact finder could be left with a definite and firm conviction that Prudential committed a mistake in denying Landree's claim for benefits.

### 2. Prudential has a conflict of interest.

When the same entity funds a plan and also evaluates claims, a structural conflict of interest exists. *Glenn*, 554 U.S. 105, 112. Here, Prudential funds the Plan and also evaluates claims, so it operates under a conflict of interest. Therefore, the *Abatie* line of cases control the outcome of this case, and heightened skepticism of Prudential's decision is warranted.

### 3. A reasonable person could be left with a definite and firm conviction that it was a mistake to deny Landree's claim.

Landree argues the Motion should be denied because Prudential shifted its reasons for denial, ignored a Social Security award, did not consider important aspects of Landree's job, and Dr. Syrjamaki's medical conclusions were not credible. Prudential argues the record shows Landree's physical ailments did not amount to a disability, Landree's situational anxiety led to his retirement, and Dr. Syrjamaki is more credible than Landree's doctors because Dr. Syrjamaki had access to all of Landree's records.

There is no checklist for district courts to apply in ERISA abuse-of-discretion cases, but the *Salomaa* court's application of the rule provides guidance on the types of things district courts may consider when weighing conflicts of interest:

> "In this case, the plan abused its discretion. Its decision was illogical, implausible, and without support in inferences that could reasonably be drawn from facts in the record, because: (1) every doctor who personally examined Salomaa concluded that he was disabled; (2) the plan administrator demanded objective tests to establish the existence of a condition for which there are no objective tests; (3) the administrator failed to consider the Social Security disability award; (4) the reasons for denial shifted as they were refuted, were largely unsupported by the medical file, and only the denial stayed constant; and (5) the plan administrator failed to engage in the required "meaningful dialogue" with Salomaa." 642 F.3d at 676.

Here, a reasonable fact finder could be left with a definite and firm conviction that a mistake was made. A fact finder could reasonably conclude that Prudential's decision was illogical, implausible and without support in inferences that could reasonably be drawn from facts in the record, because: (1) Prudential shifted their reasons for denial; (2) Prudential's conclusion that Landree had no restrictions or limitations was not supported by the record; (3) Prudential's conclusion that Landree left work due to "situational stress" was not supported by the

record; (4) Prudential did not conduct an in-person examination of Landree, and (5) Dr. Brand and Dr. Darby, who did conduct in-person examinations of Landree, concluded he was disabled.

Prudential shifted their reasons for denial. Prudential first told Landree he had no restrictions from light work and later told him he had no restrictions at all. In their original denial letter, Prudential said, "In Conclusion, we find you are reasonably capable of performing an occupation requiring light work capacity duties. Our vocational consultant confirmed the regular duties of your occupation are considered light work capacity." (0288) Prudential did not bother to wait for the results of their Labor Market survey before denying Landree's first appeal (0209) and told Landree he had "no restrictions or limitations" in the denials of his first and second appeals. (0281, 0272.) Prudential's credibility is somewhat suspect because their "reasons for denial shifted as they were refuted." *See Salomaa* at 676.

Prudential's ultimate conclusion that Landree had no restrictions or limitations was not supported by facts in the administrative record. The record shows Landree failed a physical in 2007, the Social Security Administration found him totally disabled, and Doctors Darby and Brand thought it would be dangerous for Landree to continue working. Dr. Syrjamaki disagreed but never explained exactly why someone with all of Landree's diagnoses was capable of doing heavy shift work. Dr. Syrjamaki thought Landree would "be able to fulfill the requirements of a Shift Coordinator" but did not seem to know what a shift coordinator did. Dr. Syrjamaki deftly addressed the lack of danger regarding each individual condition but provided no opinion as to their combined effect upon Landree. (0023.) Prudential's conclusion that Landree had no restrictions or limitations is unsupported by facts in the record because Prudential ignored the actual requirements of Landree's occupation and the combined effect of Landree's multiple diagnoses.

Prudential's theory that Landree left work due to situational stress was not supported by the record. There are pages of records documenting Landree's physical medical conditions but Prudential seized on a one-sentence note from psychologist Stepherson and an off-hand comment Landree made to Dr. Brand in an effort to persuade the Court that Landree made a life choice to retire. Dr. Syrjamaki apparently based the situational stress theory on a telephone conversation he had with Dr. Brand, but Dr. Brand emphasized that stress was only one contributing factor to Landree's disability. The Court understands that Prudential receives questionable claims for disability benefits regularly, but here, when viewed as a whole, the administrative record does not support a finding that Landree retired because of situational stress.

Prudential's credibility is substantially undermined because it chose to pay $2,500 for an expedited paper review rather than conduct an in-person examination of Landree that the Plan explicitly authorized. An in-person evaluator could have been given access to the same records Dr. Syrjamaki had and come to a conclusion based on both those records and an in-person examination. The Court has yet to hear an explanation for the external paper review that makes any sense. There is at least a genuine question of fact as to whether Dr. Syrjamaki was an objective reviewer or a heavy hitter brought in by Prudential to give the Company the answer it wanted to hear.

Dr. Brand and Dr. Darby, both of whom had an understanding of Landree's job requirements, thought he was disabled. It is true that test results from Dr. Lau and Dr. Rowlands were mostly negative, but these Doctors were specialists and the record does not indicate they knew anything about Landree's job requirements or were asked to make a disability determination. The record definitively shows Sandra Chapkovich did not know anything about Landree's job requirements and, on the whole, the record indicates Dr. Syrjamaki gave these

requirements little attention in his analysis. The only doctors who personally saw Landree and knew something about his job requirements, concluded he was disabled. The conclusions of Brand and Darby weigh heavily against those of Dr. Syrjamaki and Sandra Chapkovich.

Even if deference is given to Prudential's decision, a fact-finder could still be left with a firm conviction that the decision was a mistake due to Prudential's conflict of interest.

## IV. CONCLUSION

The Court was wrong to apply the de novo standard in its original order denying Prudential's Motion for Summary judgment because the Regulation cannot apply retroactively to Prudential's decision to deny benefits. The Motion for Reconsideration is GRANTED insofar as the Court applied the Regulation retroactively and based its order on a de novo review. Abuse of discretion, as explained in *Salomaa*, is the standard of review in this case.

The Motion for Reconsideration is DENIED as to the underlying Motion for Summary judgment because a reasonable trier of fact could be left with a firm conviction that Prudential made a mistake in denying benefits to Landree. Based on the Court's review of the administrative record, Prudential's conflict of interest appears to have had an effect on their decision to deny benefits, although at this time the court cannot say what the extent of this effect was or what the ultimate outcome should be.

This is a fact intensive dispute with an ever-evolving judicial standard. A one-day trial on the merits will insure the Court reaches a ruling that is based on a full understanding of facts and an accurate application of law. The parties should schedule a one-day bench trial based solely on the administrative record. The parties should focus their factual presentations on the physical requirements of Landree's occupation, the extent of his alleged disabilities in 2007, and the credibility of medical experts involved in this dispute. The parties should focus their legal

arguments on whether or not the Court has correctly identified controlling authority on the abuse of discretion standard.

**IT IS SO ORDERED.**

Dated this 4th day of August, 2011.

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE